Good morning, your honors. Elizabeth Rhodes on behalf of the United States. In the unusual position of going first. I am, your honor. I, in fact, had to ask what side I should be on to make sure I was in the right position. You know, I have, after all these years, I have no idea. People sort of get up and I have no idea which side they come from. So whatever side you're on, you're fine. I'm very glad to hear that you've... But remember, losing a trial is the best way towards first step to a successful appeal. So you'll learn this from defense counsel who knows. So go ahead. I'd like to reserve two minutes, if I may. You know, whatever you've got left on the clock. Okay. In June 2004, having reviewed both the affidavit and the supplemental affidavit that are found in the GER from pages 15 to approximately 75, and viewing the affidavit in a practical and common sense fashion, Judge Collins approved it and authorized wiretap interception. However, in 2006, when Judge Hatter looked at the affidavit and viewed it under a color in which an affidavit and a wiretap is a last step and the last resort, he supplanted his judgment for that of Judge Collins, and rather than apply a deferential standard, said if the wiretap were submitted to me, I would have found that, quote, just not enough was done. He thus suppressed the wiretap, and the government has filed this appeal. Judge Hatter's main concern, it appeared, was that not enough surveillance had been done. But the facts of this case show that ordinary investigative procedures would be ineffective in this particular case. And that is that in this case, first, Mr. Juan Garcia, it was later determined it was Juan Garcia, but a man named Juan was using a telephone to contact mostly Rivera Sanchez in Seattle. At first, he used a telephone subscribed to Pedro Lopez, and the subscriber information on that telephone is found at GER 19 and 65. Thereafter, Mr. Roman Santana and Mr. Rivera Sanchez were arrested on May 19th and 21st, and by May 25th, Juan had dropped the phone subscribed to Pedro Lopez with a fictitious address and began using a prepaid cellular phone. You know what the problem is, of course? You know, short wiretaps are sort of like a magic bullet. You know, if you can get a wiretap, it's a wonderful thing for law enforcement because you get a lot more information that way than you do practically any other way. I would have to agree with the court. It is usually our best evidence. It's a very tempting thing to want to get one of those things, and it's very easy to sort of get frustrated with more traditional methods. At the same time, we're sort of very lucky in this country that we still take wiretaps very seriously and view them as very serious intrusion. I don't think it's true in much of the rest of the world, and it's a little bit difficult to sort of tell when enough is enough. Now, here we have two district judges that made different determinations. I think it is your position that if it's a close case, the tie goes to the discretion is that of Judge Collins and not of Judge Hanna. So we review her for abuse of discretion and not him for abuse of discretion. Well, that is the government's position, but I think that position is well supported by the case law of this circuit. Is that a yes? Yes, that's a yes. I'm sorry. I'll be more brief. Yes. Okay. Now, I don't know if this is the case for it, and it may not be, but just so I understand, you have a situation where the first district judge sees the application and the evidence presented to her, and she exercises her discretion and says, I think enough has happened here, and issues are warranted. There's then an evidentiary hearing, which is Frank's hearing, Frank's type hearing, I guess, and the defendants say, well, you know, we weren't involved in that first, you know, and here are eight more things that the government could have done that the first district judge didn't consider because the government didn't put it before her. And the second district judge says, well, a lot of these additional things, which the first district judge didn't even consider, I now decide that not enough was done. In that situation, does the discretion change? Do we still review the first judge for abuse of discretion, or do we not? Do we then say, because more of this has come in, bearing on this question, we owe the deference to the second district judge? Well, if there is a Frank's finding, that is, if the second district court judge found that there had been material misstatements or omissions, then this court would give some deference to the second district court judge. No, I understand if there is a misstatement and goes to power of cause or whatever, but I'm really in a situation where there is no misstatement, the government comes in and says, we've tried these things, we can't think of anything else, and the first district judge says, okay, in that case you get a YTAP. On a Frank's hearing, a Frank's type hearing, the defendants come in and say, look, they didn't say it, but they could have, there were these other witnesses they could have interviewed, they could have done X, Y, and Z, and they didn't do those things. These are not things that they presented as possibilities to the first district judge, but it's something that the government should have considered and should have availed itself of. Does that change? And was there anything like that happen here? Well, let me, to address your first question, I don't believe that 20-20 hindsight and the addition of defense being able to say, here are additional things that could have been done without indicating that there are misstatements or omissions does change the standard of review. The standard still remains abuse of discretion of the issuing court judge. To answer your second question, which is slightly longer, that did not happen here. In total, what happened here was that Judge Hatter did hold a hearing, and there was a Frank's hearing, and the agent testified. The stuff came in, mostly it had to do with probable cause, but it seemed to me some of it at least bore or could bear on the question of reasonable alternatives. Maybe you can address that. Sure. I think that at the Frank's hearing, the defendants argued that the government could have used Roman Santana, who had been arrested in Seattle, as a confidential informant. Although he was in custody, and therefore under the case law of this circuit, including Canales-Gomez, he didn't have to be brought out of custody. The defense argued that he could have introduced a confidential informant or another person to Juan. However, under the facts of this case, the court should note that in the affidavit in support of the wiretap for Juan, it is Juan who called Roman Santana. There is only one phone call between them, and it is Juan who calls Roman Santana and says, George, and that is Rivera-Sanchez, asked me to call you. So it doesn't work the other way around. Moreover, Juan called Roman Santana using the prior target. I'm sorry, and it doesn't work the other way around because Roman doesn't have Juan's phone number? It didn't show up on his cell phone? Well, it doesn't work that way. I don't know. What are you saying? Well, I'm saying that Rivera-Sanchez was the person who could link Juan to Roman, but that doesn't mean that Roman could necessarily call Juan back. Could, could not. We don't know. Well, and... Usually when somebody calls me, I can call them right back. Unless they change their... I get calls all the time saying, hey, you called me. Well, that may be true, but the dynamic, what I'm trying to say is the dynamic was that Juan was introduced to Roman by Rivera, and Rivera didn't introduce a new person to Juan. It seemed to me the district court was most troubled by the lack of additional surveillance. I mean, as I read the transcript, and he's saying, well, why didn't you do some more? And, of course, one of the questions is had they really exhausted all reasonable avenues. How does the government respond to that? Well, if the question were could more have been done, the answer would be yes. More could have been done in this and most every other wiretap case. But the question really is did Judge Collins abuse her discretion when she decided that there was sufficient amount done? And in this case, I think you have to look at the... In all cases, you have to look at the facts of the particular case to decide if enough was done. In this case, what we have are Juan using two telephones. The subscriber to the first one is Pedro Lopez at a fictitious address. There is no subscriber information for the second. It's a prepaid. We then have several months of wiretap between San Diego and Juan, but never any meeting, or any meeting where we can actually conduct surveillance because there's no meeting location given. Mario, likewise, is using a cell phone subscribed to Juan Gonzalez. So those things can't help us. However, at one point, Mr. Rivera-Sanchez meets with Juan in Del Amo, California, in Kern County. There's some conversation back and forth, and Juan drives a 1997 Pontiac to the meeting. The Pontiac is registered to Juan Garcia, but conceitedly, that's a fairly common name. It's registered to 8056 Laurel Avenue. Nobody contends that Juan Garcia lived at 8056 Laurel Avenue. Nonetheless, even after all the wiretaps, we learned that Juan lived at the time of the takedown at 8064, but not at 8056, not at the subscriber address. Nonetheless, what the- So is the fact that they didn't do surveillance there, even though it might have been indicated by virtue of the registration, if because it turns out that that would have been dead, and does that justify not going further? Well, I think that it is the reverse situation, Your Honor. They did do a brief surveillance and spot checks throughout the night of May 20th on 8056, the registered address. One time or two times they were? Yeah, it was during the night there were spot checks. But you have to view those spot checks in light of the fact that they also did some other things, and that is they tried to see if there was a California driver's DMV records for Juan Garcia at that address. There weren't any. They also contacted the trash company to see if there was any trash collection for that address. There wasn't any. Moreover, the cell site information on the Pedro Lopez phone- Did they destroy the trash in an atomic incinerator? Apparently- I'd like to know their secret. I'm tired of hauling those bins to the curb of me. They weren't, quote, signed up for trash service, was that it? They weren't signed up for trash service. But that doesn't mean they don't have trash. And you sent agents on the scene. I mean, they must be doing something with that trash. Well, and in fact, the defendants allege, although it's nowhere in the record, that two doors down, another person was getting rid of Juan Garcia's trash. But this is all what is viewed in 2020 hindsight. I think one needs to look at what was known and what was knowable to the agents at the time. And the last point, and I think this is an important one- I think we are talking about what was knowable. You find out, I mean, people do have trash. And you call a trash company, you find that they're not signed up for service. I think a reasonable officer would not come to the conclusion, gee, they must not have any trash. That strikes me as a sort of highly unreasonable conclusion. You must say, well, they must be getting rid of their trash in some other way. We maybe should send somebody over there to observe how they're getting rid of their trash. That would be-strikes me as a more reasonable conclusion than saying, oh, my God, the trash must disappear somehow and cannot be-what do you- Well, here, let me add- Or you send somebody down in the middle of the night and they do two spot checks and you don't find anything, a car in the carport or whatever it is. You say, well, maybe we should stake somebody out there for 24 hours or 48 hours and see if a car comes in or goes out. In which case, I assume 56 and 64, whatever those two addresses, were not that far apart. They would have noticed that the guy went into what must have been two driveways down. This is not hindsight. This strikes me as entirely foresight. Well, let me give the court an additional fact that was given to Judge Collins. And that is that the cell sites for the phone that Juan Garcia had used previously came back to Los Angeles and San Diego County. That makes some sense because he's dealing with Mario in San Diego. Laurel Avenue is in Fontana in San Bernardino County. That means that the agents thought, when they looked at all the facts, A, that there was no DMV record for Juan Garcia at the address where the registered vehicle was, B, that there was no trash search, C, that his telephone wasn't registered to him, and D, and most importantly, I think, that the telephone that he was using to facilitate his narcotics trafficking wasn't hitting cell sites in the area where the registered owner to the vehicle was. So it was not necessarily reasonable to believe he lived there. Moreover, surveillance is most effective when it is conducted at a place that some criminal activity is going to take place. A drug deal, a stash house, a transaction. Agents did try to conduct surveillance on the 17th of May in Del Amo, but they were unsuccessful. So while it may have been helpful to know where Juan Garcia lived, he admittedly didn't live where his vehicle was registered, and when viewed in totality, the evidence suggested that he didn't live in Fontana or in San Bernardino County at all. And thus, the agents had taken several steps. If one views this in a common sense and practical manner, Judge Collins reasonably concluded that there was sufficient necessity and the wiretap should go forward. Thank you. We'll hear from the defendants. Good morning, Your Honors. Catherine Young from the Federal Public Defender for Ms. Mayorkin, and Irene Ayala from Mr. Garcia will also speak for a few minutes at the end. I want to turn first of all to the standard of review, the abuse of discretion that the Court has been discussing. And it's our position that there was abuse of discretion, but the Court doesn't even need to reach that, because the first issue is whether this Court reviews for clear error the factual findings made by Judge Hatter at the suppression hearing. The next issue is that the Court reviews de novo whether or not a full and complete statement of facts was submitted in compliance with 2518. And our contention is that Judge Hatter's factual findings were correct, and therefore the Court never even needs to reach the issue of whether or not Judge Collins abused her discretion. Which factual findings are you referring to? The factual findings that Judge Hatter made were, one of the things he was saying, not enough was shown. I don't think proper efforts were made. In other words, they hadn't made a sufficient finding that a full and complete statement of facts had been presented to Judge Collins. And some of the defects that he was talking about were that, for example, the only surveillance they did was a 90-minute surveillance. They didn't follow Mr. Garcia as he walked away from what they thought was going to be a five-pound deal for crystal meth. The government characterized this surveillance as very lengthy and only discontinued because there was counter surveillance involved, but that was completely repudiated during the hearing. They then did a drive-by of Mr. Garcia's residence, and they didn't see his car, and therefore they didn't go back, even though they knew that there were three co-defendants who lived within a few addresses of each other on the same street. Three targets lived within a few doors of each other, and they did no further surveillance. They called the trash collector. As Judge Kaczynski discussed, they just gave up. The trash collector said, no, we have no collection at that address. They didn't ask themselves, well, how are these people disposing of their trash? You know, I'm maybe having some trouble with the standard of review because it seems to me that one of the things you look at is to see whether there were actually misstatements or false statements and that sort of thing, and I don't see that there were any findings made to that effect here. So then why isn't Judge Hatter simply looking at the constellation of facts and making the same judgment, albeit a different one, than Judge Collins when he's talking about the facts you're talking about? Well, I do think, Your Honor, that there was a finding that there were misstatements by Judge Hatter. Could you point me to that so I can go back to the record? Absolutely. At page 314, after he granted the motion to suppress, the prosecutor asked the judge to consider the good faith analysis, and the judge said, you know, the agents relied in good faith on this warrant, therefore the evidence should not be granted. Judge Hatter responded, ordinarily you would be right, but I don't know what was in Collins' mind, and she might not have felt that without the bootstrapping of the drugs that were seized. This was a discussion that had gone on previously about how Judge Hatter was concerned about the fact that there were repeated references to large seizures of drugs in San Diego and Seattle that were tied in no way to any of the defendants in this case, but they were referenced in the affidavit. Without the bootstrapping of the drugs that were seized and all that, whether she would have perhaps asked for something more, asked the agent to go back and bring her something else. I have now presented to me the fact that it was indeed not a fact of these drugs having been seized connected directly to this defendant, and yet it's presented here. But he never... But that's not, I mean, I read that, but that's not a finding of... But even, yeah, because even if you go back earlier, when he made the similar finding, talking about, you know, that I guess it was something that happened in Seattle, but, you know, he never made like a Frank's finding. He said, well, obviously that was false, but he didn't say it was material, right? He didn't say it affected any kind of determination, and, in fact, the U.S. attorney says, well, you can just disregard the affidavit. It's still good, right? And he never, the judge never responded to that. Well, I think those are concerns that he expressed, especially in... I know that, but he never made a Frank's finding, right, did he? To the extent that the court believes he did, and I would ask that they... Well, do you think he did? Well, I think it's clearly what he's saying here, because he's denying... Well, he said, I agree he finds that that one representation was false, but, I mean, he didn't make a Frank's finding in the sense that, well, you know, I find that that was material. It's not an explicit finding, but I think it's implied in the denial. It's not any kind of finding, explicit or implicit. I'm sorry? But that's really the only finding he makes in that area, isn't it? On, you know, on, well, I'll call it falsity, right? That's the one time he makes a kind of finding of that nature, and he does not find it to be material. He doesn't state that, although I think the fact that he repeatedly talks about, I don't know what was in Judge Collins' mind, and he feels that Judge Collins was misled by the fact that she was repeatedly told about these seizures that were not, in fact, connected to any of the defendants. Just for talking purposes, let's just assume that that is not a finding that rises to the level of a false statement or omission, and we'll go back and look at it, of course. But let's assume that that's the case, that you don't have that as a foundation for your finding. What then are the findings that you're talking about that you think we need to give deference to, and how are they different than just sort of looking at the constellation of facts and figuring out should the warrant have issued or not? Well, I think then his findings are that not enough was shown that proper efforts were not made. In other words, the government had not made the showing that they're required to make under 2518 as to whether or not other investigative procedures had been tried and failed. And under this Court's authorities, the government's required to show that in a particular investigation, normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time. And I discussed some of the defects in the government showing with respect to all they did was 90 minutes of surveillance, a drive-by, they didn't pursue trash collection. There's also the case with respect to the defendant Santana up in Seattle where he allegedly had been connected with Mr. Garcia. But there's always more that can be done. So how do you then divide the line between when we defer, in this case to Judge Collins, and when we defer to Judge Hatter? Well, I think that is a concern, Your Honor. And Judge Kaczynski, as he expressed at the beginning of his remarks, wiretaps, we take them very seriously. There are statutory requirements. There are case requirements. We have to show, as this Court has held, that there's normal investigative techniques, there's a reasonable period of time, and we're arguing there's no way that the little amount that was done here could be characterized as a normal procedure that was done for a reasonable period of time. All they did was the bare minimum they had to do to put a sentence in the wiretap application under trash collection. They didn't pursue it once they found that there was a roadblock. Under surveillance, they did not do a normal investigation. They did not do it for a reasonable period of time. All they did was something to put something in the affidavit. And we're saying that Judge Hatter found that that was not enough and that those findings were reviewed for clear error, and we think that they're correct. How did the case... I guess these cases normally wind up before two different district judges, right? How does a case go to the first judge, and then how does it wind up before the second judge? I just don't know the procedure. Yeah, I'm not familiar with it either, Your Honor. I just assume that when the case comes back... Let me make a supposition. Let me make a supposition if this is right. In the central district, there's something called a criminal duty judge, and the criminal duty judge hears all the wiretap applications and approves them or not approves them. And then if a wiretap is conducted and if it results in an indictment, the case is assigned to a judge, right, to try on the wheel, and so that judge can get a motion to suppress the wiretap. Isn't that the way it gets before two different judges? Yes, thank you, Your Honor. Hypothetically, at least. Thank you. I want to reserve some time for Ms. Ayala. Thank you. Good morning, Your Honor. May it please the Court, I'm Irene Ayala, and I was appointed counsel for Mr. Juan Garcia, and co-counsel very ably discussed the issues that were of concern to defense. I would like to address the Court's concern about no explicit Frank's finding and whether the Court should have some deference to Judge Hatter's decision or Judge Collins. First of all, let me just explain that I believe that the Frank's hearing, just the opportunity to have a Frank's hearing, opens the door for the defense to bring in information that should have been brought to the attention of Judge Collins. It was not done in this case. Clearly, Judge Hatter was disturbed enough with what had not been presented to Judge Collins that he felt a hearing should be held. I agree with co-counsel that the judge made the decision to suppress the evidence without the benefit of an explicit finding, but the Court has to consider why did Judge Hatter feel that the suppression of evidence in this case was appropriate. And I don't think the Court needs to look at an explicit word in a transcript to come to a conclusion. What do you think he based his suppression on, the lack of necessity? Well, Your Honor, there are several things that troubled Judge Hatter. First of all, as indicated, the government made sure that Judge Collins thought that Juan Garcia was involved with the Seattle and San Diego organizations and the suggestion that he was involved and connected with the scale of drug activity. But he never made any finding on that of materiality, did he? Your Honor, if I may, I don't feel that in order to get due process for a defendant on a Franks hearing or a suppression motion that you need the explicit words that I feel this is material. And if I may continue, Your Honor. Isn't that the purpose of a Franks hearing? One, to find out whether it was something false, and if it's false, to see whether or not it's material. Your Honor, when I raised the issues in my initial request for the Franks hearing, the court was troubled enough that he allowed the hearing because he was concerned that material information and a false perception of a defendant's role in alleged activity was the case. I think that's part of it. Then we went to the necessity issue of what the judge was not... What case can you make, then, that I'll call it the false statement about tying that quantity to the defendant was material? Well, Your Honor, the government conceded it was false. It was material. I know that, but my question is how was it material? Well, because what it does, Your Honor, it deceives the district court judge into believing that she has to or should give a wiretap authorization because this is a person connected with a multistate drug conspiracy. Under that theory, I mean, everything would be material. Nothing would... The judge could never make a finding of, you know, nonmateriality. Well, Your Honor, if I may, it isn't just the fact that false information was given regarding activity to the judge. That was just one aspect of it. The second aspect of it was, of course, the court's concern about the lack of traditional methods, investigative methods taken, and also that the government, again, gave false information to Judge Collins about the supposedly marginal or limited success up in Seattle, and we see that, of course, that was inaccurate and that there was not only limited or marginal effort by the government here. There was no effort. The court understood there was no trash effort. Was there any evidence presented to Judge Hatter on the question of alternative efforts that the police could have made that were not presented to Judge Collins? Yes. Tell me about that. In terms of what went to Judge Hatter that did not go to Judge Collins? In terms of this question of alternative available means. Well, first of all, let's talk about, Your Honor, surveillance of Mr. Garcia himself. Judge Collins is told that there is DMV records that show an address on Laurel Avenue, and I believe it is 8056 on DMV records. It shows his true name. It shows an address in Fontana. We also know that the affidavit did say that he was based in Fontana, and that was according to the agent. There's also no surveillance taken of the other targets that are listed in that same affidavit, and there are two of them at the address right next door, Your Honor, which is 8072. Is this information that Judge Hatter got that Judge Collins did not? Yes. All of this was? No, I'm sorry. I'm sorry, Your Honor. Let me not misspeak. It was listed in the affidavit, but I cannot assume. I think the emphasis for us, Your Honor, was to show that there were not enough efforts being taken by the agents and the government on this. So in other words, it's an absence of evidence. In other words, Judge Collins has this. She knows what has been done. Always more could be done. So what was missing? Well, she wasn't aware that there was a waste collection contract for the address of the two target individuals. That was something that I presented to Judge Hatter so that there was some understanding that, you know what, Juan Garcia may not live at 8056, but two targets live right next door, and that there maybe was a reason. Is there evidence that it's right next door? Yes, Your Honor, there is. They're at 80. I think he, Mr. Garcia, did live at 8054. The address on the DMV was 8056. The two targets, Your Honor, live at 8072, which are right next door. And they just had to go there, Your Honor, and they see street numbers. I mean, it's not very difficult. That was something that, obviously, Judge Collins didn't know Judge Hatter did. The issue of the success of informants and attempts for informants up in Seattle, the term used by the agent is there was marginally successful. Well, when I dug through PACER and was able to get all these cooperation agreements and the fact that people up in Seattle were getting 5K1 substantial assistance departures and that Mr. Roman Santana had cooperated fully and immediately, even before the first affidavit is requested from Judge Collins, this was not information. Is that the person that was in custody? Yes. However, Your Honor, Mr. O'Dell, who was the first one in November 2003, was also in custody when he made the call to Mr. Roman Santana, which then began the investigation of Mr. Santana. So the fact that he's in custody and also Mr. O'Dell ends up getting, I think, the government-requested 97-month sentence, and the judge gave him 60 months because of substantial assistance, even though he's in custody, Your Honor. So all of that information regarding Roman Santana was not something that was brought to the attention of Judge Collins. It was information I was able to obtain through my own investigation. But it just made it seem, Your Honor, that the agents in the government are presenting to Judge Collins a picture of, well, you know, this investigation, this use of informants and others up in Seattle is just marginally successful. We really don't think we're going to be successful here. And that just wasn't true. And there was no effort to try and get Mr. Roman Santana, even in custody, to make one phone call to Mr. Juan Garcia in an attempt. If it hadn't worked, Your Honor, if they had done the trash collection with some vigilance, if they had done a little more surveillance other than 90 minutes and one other brief period, if they had tried to make that one phone call to Mr. Garcia and said, you know, let me send you so-and-so, whatever, I wouldn't be standing before this court because I would have been able to. One other question I had is that, obviously, wiretapping has to be quite a bit done before you really reach that point. But it's not a last resort technique. And I'm wondering, was Judge Hatter looking at this through a lens that might have been slightly skewed in viewing it as a last resort? I don't think he looked at it as a last resort, Your Honor, because on several occasions he expressed a concern at the way that the government did not present information to Judge Collins. Throughout the Franks hearing and the suppression motion, Your Honor, he expressed concern that Judge Collins wasn't given sufficient information to be able to make a decision. If she had, she may have ruled the same way, Your Honor, but she was not given what we feel is significant information. I'm not standing before this court indicating that the wiretap authorization has to come after every other reasonable measure is exhausted. And case law in the Ninth Circuit doesn't, would never support that anyway. But these agents didn't do enough, misrepresented key information to Judge Collins to lead her to believe that she was dealing with someone who had this vast conspiracy, multi-state, in order to color the judge's perception as to whether this particular wiretap was appropriate. And I think that isn't the way the statute is intended to be applied. And Judge Hatter, with just the information we gave him, Your Honor, even though there isn't an explicit Franks finding, with the information we provided to him, he said, you didn't do enough. And that was it, Your Honor. And we're merely asking that the court find that the deference belongs to Judge Hatter and not necessarily to Judge Collins at this time. Thank you. Thank you. We're mostly out of time. We're largely out of time. Would you like a minute for rebuttal? I would, Your Honor. I realize I have already had my time. I'd first like to say that in a central district, Judge Toshima is correct. There are four duty district court judges on at any one particular time. There's a wheel. Affidavit goes there, and then it's later assigned after indictment. After indictment, it gets assigned randomly regardless of who. Correct. So it could be the same judge. It probably wouldn't be. It is rarely the same judge because we have a large district court, but it has happened. In the central district, though? I would like to point out that Judge Hatter, in making his finding at GER 313, did say that a wiretap should be the last step taken and then proceeded to say, and I don't think enough was done. It's possible to make too much of a statement like that. I don't think he really meant the last step. Well, the government believes it colored his view in, A, how much should be done, and, B, in supplanting Judge Collins' decision, which should have been reviewed as an abuse of discretion. Just a minute. Speaking of that, are you saying that Judge Hatter should have reviewed that for abuse? Yes. Even after the Franks hearing? Yes, because And he had evidence that was not available to Judge Collins? Well, he didn't actually have any information that wasn't available to Judge Collins. He had almost admission that there was a false statement. Well, there were statements about what was seized in Seattle and what was seized in San Diego, but the Seattle seizures were given to show that there was drug trafficking occurring. All I'm saying is there was additional evidence before him. Well, the seizures were given to Judge Collins in that view. The physical surveillance was given to Judge Collins at GER 56 through 60, especially Paragraph 62 and 64. The fact that Ms. Majorcan had an address very near the registered owner of the Pontiac was given to Judge Collins at GER 61, Paragraph 72. The reasons that more surveillance didn't occur at the registered owner, which had no other connection that was known, was also given to Judge Collins at GER 65, specifically Paragraph 80. So there wasn't additional information given. It's just that he looked at it differently and therefore supplanted his view of how the evidence should be viewed rather than give the deferential standard to Judge Collins. Thank you, Your Honor. Okay. Thank you. Counsel, you'll stand for a minute. Thank you, Counsel. That's a very helpful argument. Let's see. Next, last case on the calendar is United States v. Lococo, Edwards v. Jackson. Ow.
judges: Kozinski, Tashima, McKeown